

# NUMBER 13-19-00507-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JOAQUIN MORALES,                                                                  Appellant,

v.

THE STATE OF TEXAS,                                                              Appellee.

**On appeal from the 111th District Court
of Webb County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Silva
Memorandum Opinion by Justice Silva**

Appellant Joaquin Morales appeals his convictions of assault-family violence,

impeding breath or circulation, a third-degree felony, and assault causing bodily injury, a

Class A misdemeanor.[1] *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B). By two issues, Morales argues (1) the evidence was legally insufficient to sustain either conviction, and (2) the trial court abused its discretion when it denied his motion for mistrial. We affirm.

## I. BACKGROUND

On October 16, 2018, Marco Camero, a Laredo Police Department (LPD) officer, was dispatched to a residence between 4 p.m. and 5 p.m. At trial, Camero stated he spoke with the complaining witness, Christina Herrera, who indicated an assault had occurred approximately twelve hours earlier around 5 a.m. Camero testified that Herrera had visible "markings to her neck area and injuries on her face." According to Camero, Herrera also appeared "kind of scared" and "concerned." Herrera claimed she had been hit in the face with a "half empty beer can" and strangled outside in the porch area by Morales, her live-in boyfriend. Camero said while there were no beer cans in the outdoor area, he did observe several empty beer cans inside the residence.

The following day, LPD Investigator David Buenrostro interviewed Herrera. Buenrostro opined that photographs taken of Herrera corroborated what she stated had occurred. Photographs depicting Herrera with red markings on the left and right sides of her neck, lacerations on her nose and above her left eye, and dried blood across her forehead were admitted at trial.

On October 19, 2018, Buenrostro contacted Morales, and he agreed to provide a statement to law enforcement. According to Buenrostro, Morales denied hitting or

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

strangling Herrera, but he admitted to pouring a beer on her head "because [Herrera] had poured a beer on him also."

Morales's full statement to police was read into the record:

On the morning of Oct[ober] 16th at around 5 a.m., [Herrera] and I started an argument due to her being drunk. She started complaining about me not helping out and making false accusations and started insulting me with lesser words. I let her know that if there was a problem with me staying there, I could grab my things and leave. As I made the move to get up, she got up and spilled the beer she was drinking over my head. As she did that, I too grabbed the beer, spilled it on her, and walked inside to get my phone, my pants, and my guitar. I kissed my sick daughter goodnight, and [I] started to walk away from the premises. As I was walking away, she proceeded to chase me. So, I started to walk away. I did not want any trouble on her because she has probation[,] and she shouldn't be drinking. She immediately threatened me over text messages[,] saying she was gonna call the cops if I didn't go back. I wasn't drunk, and I had no motive to do such a thing to my daughter's mom.

Text messages between Herrera and Morales with time stamps indicating they were sent between 5:47 a.m. and 6:15 a.m. on October 16 were also read into the record.

[Herrera:] You gonna ditch everything just like that? I work tomorrow and your daughter is sick.

[A close-up photograph of Herrera showing a bloody forehead was sent between text messages.]

Reporting that to cops if you don't answer[.]

[Morales:] [Y]ou shouldn't be drinking[.] Good l[u]ck[.] Luck[.] If [I']m going down for shit I didn't do[,] I[']m taking you down with me[.]

[Herrera:] Lol have fun on the run[.] Oh you didn[']t hit me on the head? How did I bleed like this then? Tell me?

[Morales:] [Y]our stupid ass probably did that to yourself[.]

[Herrera:] Lmao you can never take the blame for something you did[.] I would never do this cause [I']m the only one who looks after the l[o]ve of my life[.] Go to [h]ell.

3

[Morales:]     [Y]eah[,] you tell yourself that[.]

[Herrera:]     Ok then.

Herrera testified that she and Morales have a daughter together and dated for about six years. Herrera stated that in the hours leading up to the assault, she and Morales had been drinking outside. Herrera said the conversation escalated after she asked Morales to "help [her] with the chores around the house or cleaning up a bit" because he was living there with her rent-free while she was the sole financial provider. Herrera said, "[Morales] got upset and he told me that he didn't have to do any of that because he said, 'it's not like we're married or anything.'" Herrera testified that, "[o]ut of impulse and frustration," she "poured [her] open[] can of beer over his head." Morales then "proceeded to pour his beer over [her] head." When Morales attempted to go inside the home, Herrera told him he had to leave. "[Morales] turned around[,] and he pushed me to the floor . . . . [T]hat's—he mounted on top of me and he had put both of his hands around my neck and he started to strangle me."

Herrera testified that Morales strangled her for "about one minute," she was unable to "say anything because [she] couldn't breathe," and she felt pain in her neck and pressure in her head. Herrera explained she was ultimately able to push Morales off of her, and he returned inside the home while she sat outside, trying to catch her breath. Herrera testified that as she was standing up, Morales came walking out of the house holding an open beer can. Herrera said Morales struck her face with the beer can, and she felt "a lot of pain" and a burning sensation. Herrera testified that she fell down to the floor, and she watched him walk out to the driveway and turn the street corner.

4

The State questioned Herrera as to why she sent the text messages asking for him to return, and the following exchange ensued:

[Herrera:]        I felt scared, but I wanted to give him a chance to come back and to be with his daughter. He was also a big support system to me in that manner in that he would watch her while I would work.

[State:]        Okay, and why did you want to give him a chance?

[Herrera:]        [U]m, it's—I've done it before. Like this has happened before, and I've done it and he's—

[Defense counsel:]        Objection, Your Honor, to the reference, Your Honor, and it's a violation of his due-process rights, and I'm going to move for a mistrial.

THE COURT:        All right. Mistrial is denied, and the jury is instructed to disregard that last answer. Answer only the question.

[Herrera:]        Yes, ma'am.

. . . .

[State:]        Okay. Now, I want to ask you: what was the nature of you all's relationship?

[Herrera:]        [U]m, it was very toxic. We—we had a lot of altercations.

[Defense counsel:]        I'm going to object, Your Honor. May we approach?

THE COURT:        Yes.

[(]Whereupon the following bench conference was h[eld)]:

[Defense counsel:]        Your Honor, it's obvious like she's already like given up, and she's going into other incidents by the fact that she's mentioning that he's very toxic and things like that. So, I'm going to ask for the Court—for the State to instruct the witness not to make references to incidents. It's happened once, and it's going to happen again, and it's a clear violation—there's no way you can cure that from the jury. It requires a mistrial, Your Honor.

5

| [State:] | Your Honor, this is a family violence case, and as to 38.371 of the Code, it provides that in a case of family violence—it provides for the introduction, not to show character, but to show the nature of the relationship and what it was like. |
|---|---|
| THE COURT: | . . . I'm still going to ask you to watch it. So, if you need to talk to her about it— |
| [Defense counsel:] | I'm still going to object, Your Honor. That's something that was not provided as part of the notice that they would— |
| THE COURT: | Well, the nature of their relationship I can understand, but if she's going to[,] specifically going to get into other offenses, then that's going to be stricken by the Court. So, that's what you don't need to get into, unless the door is opened, and you'll need to watch that. I'll have an instruction in the Charge under "bad acts." Objection is sustained. |

(Bench conference ended)

. . . .

| [State:] | Okay. Ms. Herrera, I'm going to ask you—without telling me about specific instances, okay, and please don't give me specific instances—but what was the surrounding nature of you all's relationship? Could you describe it? |
|---|---|
| [Herrera:] | He was violent. |

Morales did not thereafter object.

On cross-examination, Herrera was asked how she could "trust" Morales enough to have him in her home if he was "really violent or very violent as [she has] stated." Herrera replied that she trusted him to take care of their daughter.

As part of his case-in-chief, Morales called a friend, Stephanie Garza, to testify. Garza testified she met Morales in February 2018. On October 16, 2018, she received a

6

phone call from Morales between 5:30 and 5:45 a.m. Garza stated she picked Morales up at a convenience store and noted that while he smelled "like alcohol," she did not see any blood on him or his belongings. "When I saw him[,] he started crying." Garza said Morales told her that he and Herrera had gotten into an argument, she spilled beer on him, and he then did the same to her. Morales told Garza that he went back inside the house to "grab his belongings, kiss his daughter goodnight, and that's when he ran out."

The jury returned a guilty verdict on both counts, and Morales and the State reached an agreement as to a recommendation on punishment. Pursuant to the recommendation, the trial court assessed punishment at one year in the county jail for the Class A misdemeanor assault to run concurrent with the felony assault sentence of five years' incarceration in the Texas Department of Criminal Justice, Institutional Division.

This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

Morales first argues the evidence was legally insufficient to convict him of either offense. *See id.* § 22.01(a)(1), (b)(2)(B).

## A.    Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778

7

(Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018); *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Walker*, 594 S.W.3d at 336.

Here, a hypothetically correct charge would instruct the jury to find Morales guilty of Class A misdemeanor assault if the State established that: (1) Morales (2) intentionally, knowingly, or recklessly (3) caused bodily injury to Herrera, (4) a member of his household or person with whom he had or had had a dating relationship. *See* TEX. PENAL CODE ANN. § 22.01(a)(1); TEX. FAM. CODE ANN. §§ 71.0021, 71.005. To support a conviction for

8

assault-family violence, impeding breath or circulation, as indicted, the State would need to establish, in addition to the aforementioned elements, that Morales intentionally, knowingly, or recklessly impeded the normal breathing or circulation of the blood of Herrera by applying pressure to Herrera's throat or neck. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B).

A person acts intentionally with respect to the result of his conduct when it is his "conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A person acts knowingly with respect to the result of his conduct when he is "aware that the conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Proof of a culpable mental state generally relies on circumstantial evidence. *Gilder v. State*, 469 S.W.3d 636, 639 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Lane v. State*, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989)); *see also Hernandez v. State*, No. 04-10-00290-CR, 2011 WL 192720, at *5 (Tex. App.—San Antonio Jan. 12, 2011, no pet.) (mem. op., not designated for publication). Intent may be inferred from a person's words, acts, and conduct. *See Gilder*, 469 S.W.3d at 639; *see also Hernandez*, 2011 WL 192720, at *5.

"'Bodily injury' means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8). "Any physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012). A jury may infer whether a person felt physical pain because "people of common intelligence understand pain and some of the natural causes of it." *Id.*; *see also Rodriguez v. State*, No. 04-17-00336-CR, 2018 WL 3635161, at *2 (Tex. App.—San Antonio Aug. 1, 2018, no pet.) (mem. op., not designated for publication) ("[A] jury is free to use common intelligence to deduce whether a victim suffered such pain from the act involved.").

9

**B.      Analysis**

Morales contends the "jury was not rationally justified in finding" him guilty of either assault because (1) his statement to police "reasonably details the set of events that transpired"; (2) Herrera provided "an unrealistic set of facts"; and (3) there was no physical evidence retrieved.

Herrera testified to two distinct assaults: (1) Morales hit her in the face with a beer can, which created multiple lacerations and caused her to bleed (the Class A misdemeanor assault); and (2) Morales put his hands around her neck for one minute, during which she struggled to breathe, could not speak, and felt pain in her neck (the third-degree felony assault-family violence, impeding breath or circulation). *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B). Photographs showing injuries arising from each assault were admitted at trial. The reporting officer additionally testified to observing injuries consistent with Herrera's claims, namely "markings to her neck area and injuries on her face." This evidence is sufficient to prove the essential elements of both the misdemeanor and felony offense, namely, bodily injury and an impediment of normal breathing. *See id.*; *see, e.g.*, *Marshall v. State*, 479 S.W.3d 840, 845 (Tex. Crim. App. 2016) (holding that the evidence was legally sufficient to support a finding that appellant impeded the normal breathing or circulation of blood of the complainant by applying pressure to her throat or neck where the complainant testified appellant held pillow against her face and she was unable to take deep breaths); *Guzman v. State*, 552 S.W.3d 936, 942 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (holding that there was sufficient evidence from which a jury could reasonably infer that complainant suffered bodily injury where the State presented evidence of the complainant's description of the

10

struggle with appellant, the officers' testimony regarding the complainant's physical injuries, and the photographs showing complainant's injuries); *see also Kane v. State*, No. 14-18-00339-CR, 2020 WL 1150541, at *4 (Tex. App.—Houston [14th Dist.] Mar. 10, 2020, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to show impeding of normal breath or circulation where the jury viewed photographs of the complainant taken the day after the offense, which depicted marks on the complainant's neck consistent with choking). Moreover, based on Herrera's testimony, a rational jury could infer that Morales acted with the requisite intent. *See Gilder*, 469 S.W.3d at 639; *see also Hernandez*, 2011 WL 192720, at *5. Finally, Morales does not dispute that the two were in a "dating relationship" or had been in a "dating relationship" as defined by the Texas Family Code. *See* TEX. PENAL CODE ANN. § 22.01(a)(1); TEX. FAM. CODE ANN. §§ 71.0021, 71.005.

Morales argues that the beer can purportedly used in the assault was not recovered and that he provided the jury with a more "reasonabl[e]" version of events, but this does not render the State's evidence insufficient. *See Walker*, 594 S.W.3d at 335; *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). We will not usurp the role of the jury in assessing weight and credibility of witnesses. *See Walker*, 594 S.W.3d at 335; *see, e.g.*, *Sanchez v. State*, 460 S.W.3d 675, 681 (Tex. App.—Eastland 2015), *aff'd*, 499 S.W.3d 438 (Tex. Crim. App. 2016) (concluding "the factfinder [wa]s free to believe or disbelieve a witness" where the appellant contended that "[b]ecause of [the complainant's] credibility, . . . without tangible evidence, expert testimony, or medical records to support her allegations, the evidence [wa]s insufficient to show that he assaulted [the complainant]"); *Smith v. State*, 352 S.W.3d 55, 62 (Tex. App.—Fort Worth

11

2011, no pet.) (noting that "it was for the jury to determine whether [the complainant] or Appellant's testimony was more credible, and [appellate courts] are not permitted to re-evaluate the weight and credibility of the evidence"). We hold the cumulative force of all the evidence, when viewed in the light most favorable to the verdict, is sufficient to support both convictions. *See Walker*, 594 S.W.3d at 335.

We overrule Morales's first issue.

### III.    MOTION FOR MISTRIAL

By Morales's second issue, he argues the trial court "erred when it abused its discretion and denied [his] motion for mistrial when [the] alleged victim testified about prior bad acts." *See* TEX. R. EVID. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

### A.    Standard of Review and Applicable Law

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion, and we uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011); *Gonzalez v. State*, 608 S.W.3d 98, 107 (Tex. App.—San Antonio 2020, pet. ref'd). "'[We] view[] the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling.'" *Gonzalez*, 608 S.W.3d at 107 (quoting *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009)). Even when the subject matter is inherently sensitive, extraneous offense evidence will not automatically lead to unfair prejudice. *Id.* (citing *Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013)); *see Bordelon v. State*, 582 S.W.3d 436, 440 (Tex. App.—San Antonio 2018, pet. ref'd) ("We remain

mindful of our mandate not to substitute our opinion for that of the trial court's and to afford 'great deference' to the trial court's decision.").

A mistrial is appropriate in extreme cases of highly prejudicial error when spending any further time or effort on trial "would be wasteful and futile." *Gonzalez*, 608. S.W.3d at 108 (quoting *Ocon*, 284 S.W.3d at 884). When reviewing a trial court's denial of a motion for mistrial, the court of criminal appeals has adopted a three-factor approach, which balances (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of the punishment (i.e., the likelihood of the conviction absent the misconduct). *Gonzalez v. State*, No. AP-77,066, __ S.W.3d __, __, 2020 WL 6482409, at *46 (Tex. Crim. App. Nov. 4, 2020) (citing *Lee v. State*, 549 S.W.3d 138, 145 n.8 (Tex. Crim. App. 2018)); *see also Garcia v. State*, No. 04-19-00775-CR, 2021 WL 185525, at *7 (Tex. App.—San Antonio Jan. 20, 2021, no pet. h.) (mem. op., not designated for publication) (applying the three-factor test). "If there is no indication of bad faith, and the objectionable testimony does not appear calculated to incurably inflame the jury, then an instruction to disregard will likely suffice." *Gonzalez*, 608 S.W.3d at 107.

## B.    Analysis

Assuming without deciding that Herrera's statements were improper and that Morales properly preserved this issue for review, we first note that at no point did Morales request an instruction to disregard Herrera's statements.[2] After Morales's first objection,

---

[2] Morales did not object to Herrera's subsequent testimony that Morales had been "violent" in the past, and Morales failed to request a curative instruction on either of Herrera's objected-to comments; instead, Morales requested a mistrial. To preserve a complaint of this nature, a defendant must first urge his objection until he obtains an express or implicit adverse ruling and re-object as necessary. *See* TEX. R. APP. P. 33.1(a); *Archie v. State*, 221 S.W.3d 695, 698 (Tex. Crim. App. 2007); *Hinojosa v. State*, 433 S.W.3d 742, 761 (Tex. App.—San Antonio 2014, pet. ref'd). In addition to objecting to the improper statement, the defendant must request a curative instruction if the error is curable and make a motion for a mistrial. *Unkart v. State*, 400 S.W.3d 94, 98–99 (Tex. Crim. App. 2013); *Hinojosa*, 433 S.W.3d at 761. "A party may skip

the trial court sua sponte instructed the jury to disregard the complained-of statements. Following Morales's second objection, defense counsel argued there was "no way you can cure that from the jury." *See Brewer*, 367 S.W.3d at 253. For reasons discussed below, we disagree with defense counsel's assessment.

First, the State's questions to Herrera were not phrased so as to provoke a response referencing an extraneous offense or bad act. *See Lee*, 549 S.W.3d at 145 n.8; *see also Garcia*, 2021 WL 185525, at *7. While Morales complains that Herrera should have been instructed that she was prohibited from referring to any prior bad acts, "[m]ost trial lawyers would readily attest that witnesses sometimes mistakenly deviate from carefully conveyed instructions." *See Crawford v. State*, 595 S.W.3d 792, 804–05 (Tex. App.—San Antonio 2019, pet. ref'd). Moreover, Herrera's testimony—"this has happened before" and "it was very toxic. We—we had a lot of altercations"—were fleeting and did not refer to any incident with any sort of specificity. *See id.*

Under these circumstances, there is no persuasive reason to doubt that a curative instruction was effective. *See Lee*, 549 S.W.3d at 145–46; *see, e.g., Rojas v. State*, 986 S.W.2d 241, 250–51 (Tex. Crim. App. 1998) (holding the trial court did not abuse its discretion in overruling appellant's motion for mistrial where a witness's comment that the appellant had "past violence" was not a concrete reference to an extraneous offense, but merely vague speculation); *Jackson v. State*, 495 S.W.3d 398, 421 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding testimony by defendant's girlfriend that defendant

---

the first two steps and request a mistrial, but he will be entitled to one only if a timely objection would not have prevented, and an instruction to disregard would not have cured, the harm flowing from the error." *Unkart*, 400 S.W.3d at 99; *Brewer v. State*, 367 S.W.3d 251, 253 (Tex. Crim. App. 2012) ("The appellant did not request a curative instruction before moving for a mistrial—a choice that forfeited appellate relief for an error that could have been cured by such an instruction.").

"had a record from Louisiana" did not warrant mistrial because the trial court immediately instructed the jury to disregard the testimony); *Keith v. State*, 384 S.W.3d 452, 461 (Tex. App.—Eastland 2012, pet. ref'd) (concluding that witness's statement that appellant was on parole "was adequately addressed by a sustained objection and an instruction to disregard" because the statement was "at most an oblique reference to an extraneous offense"); *see also Davis v. State*, No. 04-15-00602-CR, 2016 WL 4537927, at *10 (Tex. App.—San Antonio Aug. 31, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding that a witness's statement that "this ain't the first time it happened" was brief and nonspecific, and trial court's instruction to disregard was given immediately after the statement and was the proper curative measure).

As to the last prong, regarding the certainty of the punishment absent the misconduct, the record firmly supports the conviction without considering Herrera's objected-to testimony. *See Lee*, 549 S.W.3d at 145 n.8; *see also Garcia*, 2021 WL 185525, at *7.

Accordingly, we conclude that the trial court did not abuse its discretion when it denied Morales's motion for mistrial. *See Archie*, 340 S.W.3d at 738; *Gonzalez*, 608 S.W.3d at 107. We overrule Morales's second issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
11th day of March, 2021.

15